UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TAURUS CAFÉ, INC.,
    *Plaintiff*,

v.

DEAN M. ESSERMAN, *et al.*,
    *Defendants*.

No. 3:14-cv-0715 (JAM)

**MEMORANDUM OF DECISION**

In the early morning hours of March 30, 2013, the police responded to the scene of an apparent homicide in the Newhallville section of New Haven, Connecticut. The investigation quickly led them about half a block away to a nightclub/bar known as the Taurus Café. The police learned that the bar had video cameras that might have recorded the victim's last moments and any encounter with his assailants. Because the bar was closed and the police did not have consent to enter, the police eventually secured a court-authorized search warrant to enter the bar and to seize its video-recording storage system.

In this civil lawsuit, the corporate owner of the bar—a limited liability company known as Taurus B, LLC ("Taurus")—claims that eight police officials of the City of New Haven violated its constitutional rights under the Fourth Amendment in the manner that they executed the search warrant. Taurus claims that the police stole about $27,000 of cash from the basement below the bar and that the police otherwise used unnecessary and destructive means to execute their search.

The matter proceeded to a bench trial before me last week. I now rule that Taurus has failed to prove by a preponderance of the evidence that any of the police defendants violated Taurus's constitutional rights.

**BACKGROUND**

According to the complaint in this case, Taurus does business as the Taurus Café at 520 Winchester Avenue in New Haven, Connecticut. Doc. #21 at 1 (¶ 3). The defendants named in the complaint are eight officials of the New Haven police: Chief of Police Dean M. Esserman; Assistant Chief of Police Achilles Genoroso; Assistant Chief of Police Alfonso Vazquez; Lieutenant Racheal Cain; Lieutenant Otoniel Reyes; Detective Nicole Natale; Detective Michael Wuchuk; and Detective David Zawewski.

According to the operative complaint that was filed by Taurus in this action, the police officer defendants "in the presence of and under the direct supervision" of Police Chief Esserman "battered down the door to the Taurus Café and forcibly entered the basement thereof for the purpose of conducting the search authorized by the [search] warrant." Doc. #21 at 2-3 (¶ 8). The complaint further alleges that the defendants acted in the immediate presence of Police Chief Esserman to "inflict[] significant and utterly unnecessary damage to the area of the search" and that "one or more of the said defendants absconded with approximately $27,000 in cash receipts from the café." *Id.* at 3 (¶9).

At trial, Taurus called all eight of the police defendants as witnesses and then called Larry Livingston, who was the manager of the Taurus Café. Defendants presented the testimony of one more police officer witness in the defense case. I will summarize below the testimony of the police officer defendants, followed by a summary of the testimony of Larry Livingston.

*A. Testimony of Defendant Police Officials*

With minor differences among their accounts, the police officer defendants testified to the following facts. At approximately 2:30 a.m. on March 30, 2013, New Haven police responded to a gun shot homicide scene on Thompson Street in the Newhallville section of New

Haven.[1] The police quickly learned from a witness that the victim and possible perpetrators had been in an altercation at the nightclub/bar known as the Taurus Café, about half a block away at the corner of Thompson Street and Winchester Avenue. The police knew that the bar had both internal and external surveillance cameras, and the police had an obvious interest in immediately securing and reviewing any telltale footage from these cameras.

But, according to the testimony of all the police officer defendants, the police could not gain permission to enter the bar. The door to the bar was locked, and no one answered. The bar's manager—Larry Livingston—was nowhere to be seen. The bar's "bouncer" appeared outside and spoke with the police. Although he had keys to the bar, he told the police that Livingston would not allow them to go in. The police tried to call Livingston, but there was no answer. The police knew or learned that Livingston lived just upstairs above the bar; they went up an exterior stairway and banged on the door, but Livingston did not answer.

Unable to gain access by consent, the police decided to apply for a search warrant. They went to the home of a state court judge, and the judge signed a warrant at 6:30 a.m. that was prepared by Detectives Wuchek and Zaweski. The warrant authorized the police to search the bar (including the basement) and to seize the "hard drive video/data storage system for the Taurus Café'[s] video security system." Def. Exh. #1 (search warrant and affidavit).

Detectives Wuchek and Zaweski promptly took the warrant to the bar, and the police made one more try to find or speak with Livingston before they executed the warrant. After this effort failed, the police decided to forcibly enter the bar. The fire department was called, and fire personnel used a hydraulic device to force open the front door. The police knocked on the door before the forced entry was made. At least seven of the eight police defendants in this case then entered the premises to execute the warrant: defendants Cain, Generoso, Natale, Reyes, Wuchek,

---

[1] The victim was Eric Forbes, and the police have not to date made any arrests in the case.

Vazquez, and Zaweski.[2] It was unclear from the trial testimony whether other police officers or fire personnel entered the bar during execution of the search warrant.

Once inside the bar, the police entered a ground-floor area where there was a liquor bar area, a dance floor, and a DJ booth. Inside the DJ booth they found two digital video recorders (DVRs) that they thought might have video images stored on them from the bar's numerous cameras. The police devoted as long as 30 minutes or more to trying to trace the wires from the DVR devices up through the ceiling to verify a connection to the cameras and then to removing the DVR equipment. This effort involved considerable displacement of ceiling tiles and pulling on some wires. The police were unable to locate a video monitor for the camera system, notwithstanding considerable efforts to find it throughout the premises.

As noted above, the search warrant also authorized the police to search the basement. The police found a door with a padlock on it, and they broke open the lock to find a stairway leading down to the basement. The stairway was wobbly, and the police were unable to find any lights. Three of the officers (Cain, Reyes, and Zaweski) testified that they did no more than go part way down the stairs to look around with their flashlights. One officer (Wuchek) testified that he went just to the bottom of the stairs and that he was down there less than a minute. Three of the officers (Generoso, Vazquez, and Natale) testified that they did not go into the basement at all. All of the officers testified that they saw nothing of value and took nothing from the basement.

The police were inside the bar for a total of 45 minutes to one hour. They removed the two DVRs, power cords for the DVRs, remote controls, a computer mouse, and three instruction manuals. They left a copy of the warrant behind. Because the front door of the bar had been

---

[2] The Chief of Police—Dean Esserman—was present at the scene earlier in the morning but was no longer present when the officers entered the bar. Accordingly, without objection, the Court dismissed Esserman as a defendant in this case shortly after the conclusion of trial evidence for lack of any evidence that Esserman had anything to do with any violation of Taurus's Fourth Amendment rights.

breached without means to re-lock it, they also assigned at least one patrol officer outside the door to stand guard until the premises could be secured or turned over to an owner. The trial testimony did not make clear how long this officer remained after execution of the warrant or whether anyone else had access to the bar until the bar's manager—Larry Livingston—returned to the bar later in the day (as described below).

### B. Testimony of Larry Livingston

Larry Livingston—the manager of the Taurus Café—testified to facts that were inconsistent in major respects with the preceding testimony of the defendant police office officers. He testified that he closed the bar on March 30, 2013, at its usual closing time of 2:00 a.m. Soon he became aware of a police presence nearby to investigate a shooting. He did not want to leave the bar because of the police presence, and so he remained inside the bar with the bar's bouncer—Julius Dennis—while the police were outside. According to Livingston, Dennis went in and out of the bar, but the police would not let Dennis leave and go home. Livingston stated that, although he left the front door of the bar unlocked, no police officers came to the door to seek entry or to try to speak with him. By around 6:00 a.m., Livingston was tired, and he went upstairs to his second floor home to go to sleep.

Livingston slept until around 12:30 p.m. to 1:00 p.m. when he was awoken by his son—Maurice Livingston—who showed him that a search warrant had been left at the bar. Livingston went downstairs to the bar where he saw that the front door had been breached, that the bar area was in disarray with ceiling tiles shifted, that some wires were hanging down from the ceiling, and that the two DVR's from the DJ booth had been removed.

Livingston also testified that he saw that two doors that led into the basement had been breached. One door had been locked, and the door had had its hinge pins removed. The other had been padlocked, and the padlocked had been broken away.

According to Livingston, he went down into the basement and discovered that a large amount of cash that he had kept down there was missing. Livingston said that he kept at least $27,000 in cash in a cigar box that was on top of a safe inside a closet in the basement. The closet door was not locked, and Livingston had not stored the money in the safe because he was prone to forget the safe's combination. Despite the fact that the money was left loose outside the safe in an unlocked closet, Livingston testified that he had thought the money was secure because he kept under lock-and-key the first-floor access doors to the basement. Livingston had not gone down to the basement after closing the bar on March 30; he had last seen the cash in the cigar box more than 24 hours before when he had closed the bar in the early morning hours of March 29.

Livingston waited for at least a day before calling the police about the missing money. At about 5:00 p.m. on April 1, 2013, two police officers came to the bar and met with Livingston about his report of missing money. Livingston testified that that he told one of the officers—Officer Tyren Robinson, who also testified at trial—that the money was missing but that he did not know who took it. My trial notes reflect that Livingston testified: "I told him that the money is missing. I didn't state who took it. I don't know who took it. I just said the money is missing."[3]

Livingston was unable to say with any precision at trial how much money was missing. He estimated at least $27,000 but thought it could be more. He said that about $25,000 of the cash was his own and that the remainder belonged to plaintiff Taurus as receipts from the

---

[3] Officer Robinson's report of his meeting with Livingston was an exhibit at trial. Pl. Exh. #1. According to Robinson's report, Livingston said that the missing money was between $30-$40,000 and that he had last seen the money after closing the bar at 2:00 a.m. on March 30, 2013 (not a day before as he testified at trial).

6

bar/nightclub business. Livingston testified that his personal cash of $25,000 or more had come from a large insurance payout a few years before.

## FINDINGS OF FACT

Based on my consideration of the testimony of each of the witnesses, I find that the accounts of each of the police officer defendants were credible in all material respects. By contrast, I find that the testimony of Livingston was not generally credible.

Livingston's account lacked basic corroboration of the type that would be reasonably expected from a plaintiff to support its claim. There were no photographs to document his claim of damage to the bar. There were no financial or business records to support any claim of business loss to the bar, nor any of Livingston's records to substantiate his claim that he had received a large insurance payout and converted it to cash for storage in his basement.

Nor did Taurus call witnesses (or explain its failure to call such witnesses) who could reasonably have been expected to corroborate Livingston's account. For example, Taurus did not call Julius Dennis—the bar's bouncer—as a witness to back up Livingston's claim that the police did not try to contact him at any time before they forced their way into the premises. Taurus did not call any of its corporate owners—Livingston's son, Maurice, or daughter—who presumably could have testified about Taurus's finances and loss of receipts allegedly owned by the bar.

The lack of basic corroboration was compounded by the implausibility of much of Livingston's testimony. For example, Livingston claimed that he was aware of the police presence just outside the bar but that he remained inside the bar with the bar's bouncer for several hours without knowing that the police sought access to any of the bar's video recordings. Apart from the contrary and credible testimony of numerous police officials that they actively and repeatedly sought to contact Livingston inside the bar and at his home on the second floor

above, it is implausible to believe that the police would not have made such efforts to contact Livingston and that they would have consigned themselves instead to a time-staking process of drafting a search warrant and tracking down a judge to sign a search warrant in the wee hours of the morning. It is clear to me that Livingston knew that the police sought his help to catch one or more potential perpetrators of a homicide and that he did not want to help.

Several of the police defendants testified that the police went up an exterior stairway of the building and banged on a second-floor door at the top in hopes of speaking with Livingston (both before they got the search warrant and after they got the search warrant). During Livingston's direct testimony, he claimed that the police could not have done so without having to pass through a locked door at the ground-floor level to get to the second floor. This claim was shown to be false on cross-examination by a photograph of the building that showed an unlocked exterior stairway leading to a door on the second floor.

Livingston's claims about stolen money were equally problematic. To begin with, it is unlikely that anyone would keep tens of thousands of dollars in loose cash on top of a safe in a basement just below a busy nightclub operation. Nothing that Livingston said made this seem more likely. He inexplicably waited at least a day or more to contact the police to report that the cash was missing. Although Livingston claimed at trial that almost all the money taken was his own personal money, this claim is contradicted by the complaint that accuses the defendants of stealing "approximately $27,000 in cash receipts from the café." Doc. #21 at 3 (¶ 9). When he spoke to Officer Robinson on April 1, 2013, Livingston claimed that $30,000 to $40,000 was missing, in contrast to the claim of the complaint that "approximately $27,000" was missing. And Livingston had no persuasive answer when asked why no insurance claim was made for the alleged theft of his or Taurus's money.

In any event, even if I were to conclude that any money at all was stolen, Taurus fell well short at trial of proving that any of the police defendants stole it. None of its trial evidence tended to show any grand cabal among all eight of the police defendants to steal the bar's money. To the contrary—and contrary to Taurus's foundational claim as alleged in the complaint that Chief Esserman was personally present while his police officers were battering the Café's door down and stealing the money—Taurus altogether abandoned any claim against Chief Esserman at trial for lack of any evidence that Chief Esserman was even present upon entry or ever entered the premises at all.

As to the remaining police officer defendants, the trial evidence did not otherwise tend to show that any particular defendant or subset group of the eight defendants took the money (or that they knew that some other officer took the money and failed to intervene). Assuming any money to be stolen at all, the evidence introduced by Taurus would give rise to equally consistent theories that any one or different numbers of officers stole the money.

Taurus seeks damage awards against individual defendant police officers. Because the evidence did not show that any one of the officer defendants was more likely than any other to have stolen the money (if money was stolen at all), it would be the sheerest of guesswork for me to hold one or more officers are liable while letting the remaining officers go free.

### CONCLUSIONS OF LAW

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A predicate to any claim of a Fourth Amendment violation is that there has been either a "search" or a "seizure." A "search" for purposes of the Fourth Amendment occurs when the police intrude upon a person's reasonable expectation of privacy, or if the police otherwise

trespass upon a person's body, house, papers, or effects for the purpose of acquiring information. *See Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). A "seizure" of property for purposes of the Fourth Amendment occurs when the police meaningfully interfere with an individual's possessory interest in that property. *See Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992).

A search is presumptively reasonable and consistent with the Fourth Amendment when executed in accordance with and subject to the limits imposed by a court-authorized search warrant and that is based upon a judicial determination of probable cause. *See, e.g., United States v. Voustianouk*, 685 F.3d 206, 211 (2d Cir. 2012). When the police have a search warrant for physical premises, they are authorized and consistent with the knock-and-announce rule, to forcibly enter the premises and other areas within where evidence within the scope of the warrant may be found. *See, e.g., Wilson v. Arkansas*, 514 U.S. 927 (1995); *United States v. Kyles*, 40 F.3d 519, 523-24 (2d Cir. 1994).

At closing arguments, Taurus conceded that the search warrant was valid, and Taurus also abandoned its claim that the police's entry by force into the bar was a violation of the Fourth Amendment. Taurus's remaining claims as advanced at closing argument are: (1) that defendants unconstitutionally seized approximately $2,000 of Taurus's money (apart from the approximately $25,000 seized that allegedly belonged to non-plaintiff Larry Livingston); (2) that defendants unconstitutionally broke the padlock on the door leading to the basement; (3) that defendants unconstitutionally left the premises in damaged condition with ceiling tiles moved and wires hanging; and (4) that defendants unconstitutionally exceeded the scope of the search warrant by seizing not only the DVRs but also a computer mouse and three instruction manuals for the DVRs.

First, Taurus claims that defendants stole about $2,000 in cash that belonged to the bar. For the reasons I have extensively described above, I conclude that Taurus did not prove by a preponderance of the evidence that any of its money was stolen or that, if so, any of the police defendants stole it.

Second, Taurus claims that, instead of breaking the padlock on a door that led to the basement, the police should have used an alternative door that also led to the basement. Even accepting Livingston's testimony that there are two doors that led to the basement, there was no evidence to suggest that the police knew this to be so at the time of entry. They had the right under the warrant to search the premises including the basement and therefore to breach such barriers as they did in breaking open the padlock. Whether they knew *ex ante* that this padlocked door led to the basement, they had authority under the warrant to breach the padlock in search of items within the scope of the warrant. Moreover, in light of Livingston's testimony that the second door to the basement was locked, the police would have had to breach the lock to that door if they had not breached the padlocked door in the first instance.

Third, Taurus claims that the police improperly moved ceiling tiles and left wires hanging. But the trial evidence amply established that the police had good reason to disturb the ceiling tiles and wire in order to ascertain a connection between the DVRs and the bar's surveillance cameras. Absent proof of unreasonable or malicious conduct, "it is well recognized that 'officers executing search warrants on occasion must damage property in order to perform their duty.'" *Cody v. Mello*, 59 F.3d 13, 16 (2d Cir. 1995). And "it is settled that some disarray in conducting a search, including the tangential destruction of items that could not contain the object of the search, does not state a claim of constitutional magnitude." *Vaher v. Town of Orangetown, N.Y.*, 133 F. Supp. 3d 574 (S.D.N.Y. 2015).

Lastly, Taurus claims that the police exceeded the scope of the warrant by means of seizing a computer mouse and DVR instruction manuals. The warrant authorized the seizure of the "hard drive video/data storage system for the Taurus Café'[s] video security system." It is far from clear to me that the mouse and instruction manuals could not be considered as part of the "system" and potentially necessary to the operation of the DVRs and recovery of images therein. In any event, the complaint did not allege that the officers exceeded the scope of the warrant in terms of their seizure of computer-related equipment. Nor did the evidence establish that these items seized belonged to Taurus rather than to Livingston in the first place, such that Taurus has not established its standing to contest the seizure of additional computer-related items.[4]

## CONCLUSION

Taurus has not proven by a preponderance of the evidence that any of the police defendants in this case violated the Fourth Amendment.

The complaint is hereby DISMISSED.

Judgment shall enter forthwith, and the Clerk of Court shall close this case.

Dated at New Haven this 5th day of May 2016.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[4] Because I conclude that there was no Fourth Amendment violation at all, I need not further consider whether the police officer defendants have qualified immunity.